IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

**DEUTSCHE BANK TRUST COMPANY**
**AMERICAS,**

    **Appellant,**

**v.**                **Case No. 3:20cv419**

**GYMBOREE GROUP, INC.,** *et. al.*,

    **Appellees.**

## <u>MEMORANDUM OPINION</u>

   This matter comes before the Court on Appellant Deutsche Bank Trust Company

Americas ("Deutsche Bank") appeal from the May 26, 2020 Order of the Honorable Keith L.

Phillips, United States Bankruptcy Court Judge, granting summary judgment to Appellee

Gymboree Group, Inc ("Gymboree").[1]  (Bankr. Case No. 19-03071, ECF No. 1.)  Gymboree

filed a Response Brief, (ECF No. 9), and Deutsche Bank replied, (ECF No. 11).  Gymboree also

filed a motion to dismiss the appeal as frivolous (the "Motion to Dismiss").  (ECF No. 8.)

Deutsche Bank responded to the Motion to Dismiss, (ECF No. 10), and Gymboree replied, (ECF

No. 12).

   The Court dispenses with oral argument because the materials before it adequately

present the facts and legal contentions, and argument would not aid the decisional process.

Accordingly, the matters are ripe for disposition.  The Court exercises jurisdiction pursuant to 28

---

[1] The named Appellees include Gymboree Group, Inc., Giraffe Intermediate B, Inc.,
Gym-Card LLC, Gym-Mark, Inc., Gymboree Manufacturing, Inc., Gymboree Retail Stores,
LLC, Gymboree Operations, Inc., Gymboree Wholesale, Inc., Steven Coulombe, David Inouye,
and Michael Foster.  For ease of reference, the Court refers to Appellees as Gymboree.

U.S.C. § 158(a)(1).[2]  For the reasons that follow, the Court will deny the Motion to Dismiss and affirm the judgment of the Bankruptcy Court.

## I.  Factual and Procedural Background

This appeal considers whether Gymboree improperly transferred two million dollars in alleged trust funds to an account subject to a lien in favor of its secured creditors.  Deutsche Bank—an unsecured creditor in the bankruptcy proceedings below—and Gymboree dispute whether the confirmed Chapter 11 plan required the funds at issue to be held in trust for the general unsecured creditors.  The Bankruptcy Court ruled that the Chapter 11 plan did not create such a trust and ruled in favor of Gymboree.  Deutsche Bank appealed.

### A.  Deutsche Bank and Gymboree Stipulate to the Undisputed Facts

In the underlying bankruptcy proceeding, Deutsche Bank and Gymboree filed a stipulation of undisputed facts, which the Court refers to here.  (App. 757, ECF No. 9.)[3]  On June 11, 2017, Gymboree filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code ("the 2017 Bankruptcy Case").  (App. 759.)  On September 7, 2017, the Bankruptcy Court entered its order confirming ("Confirmation Order") the Joint Chapter 11 Reorganization Plan of Gymboree (the "2017 Plan").  (*Id.*)  The 2017 Plan became effective on September 29, 2017.  (*Id.*)  Relevant to this appeal, the 2017 Plan defined the "[General Unsecured Creditors] Distribution" as "$4,500,000 in Cash, to be funded on the Effective Date into the Class 5 Claims Reserve and distributed in accordance with the Plan."  (Order

---

[2] "The district courts of the United States shall have jurisdiction to hear appeals (1) from final judgments, orders, and decrees . . . of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under [28 U.S.C. § 157] . . . ."  28 U.S.C. § 158(a)(1).

[3] The Court refers to the designated record as "R," (ECF Nos. 2, 3, 4), and the appendix as "App."  (ECF No. 9.)  The stipulation of undisputed facts may be found at Appendix 757–61.

Confirming the Joint Chapter 11 Plan of Reorganization of the Gymboree Corporation and its

Debtor Affiliates, "2017 Plan," 84, ECF No. 2–7.)  The 2017 Plan further provided that:

> On the Effective Date, the Reorganized Debtors shall establish the Class 5 Claims
> Reserve, which Class 5 Claims Reserve shall be funded with the [General
> Unsecured Creditors] Distribution and shall be administered by the Reorganized
> Debtors.  As soon as practicable after the Effective Date, the Reorganized Debtors
> shall make a Pro Rata distribution to all Allowed Class 5 Claims from the Class 5
> Claims Reserve using the [General Unsecured Creditors] Amount as the
> denominator in calculating such Pro Rata Distribution.  The Reorganized Debtors
> shall make one or more additional distributions to Class 5 Allowed Claims, in its
> discretion, until all Class 5 Claims have been resolved.  **The Reorganized
> Debtors shall hold Cash in the Class 5 Claims Reserve in the same Pro Rata
> share in trust for the benefit of the Holders of Disputed Class 5 Claims**.  Once
> all Class 5 Claims have been resolved, the Reorganized Debtors shall make a final
> distribution in order to distribute the remaining Cash in the Class 5 Claims
> Reserve Pro Rata to all Class 5 Allowed Claims using the total amount of Class 5
> Allowed Claims as the denominator . . . .

(2017 Plan 114 (emphasis added).)[4]  Paragraph 140 of the Confirmation Order further provided

that "the Debtors or the Reorganized Debtors, as applicable, shall establish on the Effective Date,

a *segregated account* by depositing the [General Unsecured Creditors] Distribution into the

Class 5 Claims Reserve for the benefit of Holders of Allowed Class 5 Claims to be paid as set

forth in Article VII.D of the plan."  (2017 Plan 64.)

In a separate article, the 2017 Plan further stated that certain fees would be held in trust

and not considered property of the estates:

> On the Effective Date, the Reorganized Debtors shall establish and fund the
> Professional Fee Escrow Account with Cash equal to the Professional Fee
> Reserve Amount.  **The Professional Fee Escrow Account shall be maintained
> in trust solely for the Professionals.  Such funds shall not be considered
> property of the Estates.**  The amount of Professional Fee Claims owing to the
> Professionals shall be paid in Cash to such Professionals by the Reorganized
> Debtors as soon as reasonably practicable after such Professional Fee Claims are

---

[4] The Amended Joint Chapter 11 Plan of Reorganization of the Gymboree Corporation
and its Debtor Affiliates and the corresponding Confirmation Order from the 2017 Bankruptcy
Proceeding, Case No. 17-32986, is found in the Designated Record at ECF No. 2.  (*See* ECF No.
2–7.)

> Allowed.  When all Allowed amounts owing to the Professionals have been paid
> in full, any amount remaining in the Professional Fee Escrow Account shall
> promptly be paid to the Reorganized Debtors without any further action or order
> of the Bankruptcy Court.  If the Professional Fee Escrow Account is insufficient
> to fund the full Allowed amounts of Professional Fee Claims, the remaining
> unpaid Allowed Professional Fee Claims will be paid by the Reorganized
> Debtors.

(2017 Plan 92.)

On or about September 29, 2017, the effective date of the 2017 Plan, David Inouye, a Gymboree employee, deposited the General Unsecured Creditors distribution into an account pursuant to the 2017 Plan and Confirmation Order.  (App. 759.)  With the $4,500,000 deposited, Inouye then purchased investments using the General Unsecured Creditors distribution.  (*Id*.)  On May 3, 2018, Gymboree removed $2,532.283.94 from that investment account to make an initial distribution to "holders of allowed Class 5 Claims under the 2017 [P]lan."  (*Id*.)  Deutsche Bank held an allowed Class 5 Claim and "as the former indenture trustee, received $2,510,193.01 of the Initial Distribution for the benefit of itself and the holders of the 2018 Notes."  (*Id*.)

One year later, on October 1, 2018, Gymboree engaged Berkeley Research Group to provide services regarding its cash management and distributions.  (*Id.* at 759–60.)  On January 9, 2019, Berkeley Research Group directed [Inouye] to transfer the remainder of the General Unsecured Creditors distribution, $2,027,304.08, into a different account, referred to as the "Concentration Account."  (*Id.* 760.)  Following that transfer, the General Unsecured Creditors account had a balance of $0.00 and the Concentration Account had a balance of $3,146,826.75.  (*Id*.)  Deutsche Bank received no further payments from the General Unsecured Creditors Distribution.  On January 11, 2019, the last transfer from the Concentration Account occurred, consisting of an outgoing wire transfer of $5,849,678.26.  (*Id*.)  Five days later, on January 16,

4

2019, Gymboree filed a second voluntary petition for relief under Chapter 11 of the United

States Bankruptcy Code ("the 2019 Bankruptcy Case").  (*Id.*)

> **B.     Deutsche Bank Initiates an Adversary Proceeding Against Gymboree
> Seeking a Determination that Gymboree Improperly Transferred Funds to
> an Account Subject to a Lien in Favor of its Secured Creditors**

Deutsche Bank did not receive any proceeds from the final distribution of the

Concentration Account.  (R. 14, 22, ECF No. 2.)  Deutsche Bank received only the

$2,532.283.94 initial distribution as a holder of an Allowed Class 5 Claim in accordance with the

2017 Plan.  (App. 759.)  The remainder of the General Unsecured Creditors Distribution amount

went to secured creditors after being transferred to the Concentration Account.

After Deutsche Bank learned that Gymboree had the funds transferred to the

Concentration Account, which was subject to a lien in favor of Gymboree's secured creditors,

Deutsche Bank initiated the underlying adversary proceedings.  (R. 3, ECF No. 3.)  In its

Complaint, Deutsche Bank asserted that it suffered "breach of trust and conversion of funds that

had been held by Gymboree" under the 2017 Plan.  (App. 16–17.)  Deutsche Bank also brought

two aiding and abetting claims based on breach of trust and conversion, along with a claim for

turnover of property and a claim for civil contempt.  (App. 28–30.)  Deutsche Bank claimed that

the 2017 Plan "expressly obligated [Gymboree] to hold the reserve in a segregated account in

trust for the benefit of Class 5 (general unsecured creditors) pending interim distributions and the

final distribution to such creditors."  (App. 21.)  Rather than distributing the funds to Class 5

Claims holders, Gymboree transferred the money to the Concentration Account, which "was

subject to a lien in favor of the certain secured lenders."  (App. 25.)

Gymboree filed a motion to dismiss, (R. 4–5), and Deutsche Bank responded in

opposition, (R. 6).  Deutsche Bank filed a motion for summary judgment for civil contempt,

(R. 8), and Gymboree filed a renewed motion to dismiss and motion for summary judgment.

(R. 9).  In its motion for summary judgment for civil contempt, Deutsche Bank argued, relevant

to this appeal, that

> when the claim allowance process was completed in December 2018, [Gymboree]
> violated the Confirmation Order by withholding the mandatory final distribution
> of the Reserve to the holders of allowed Class 5 Claims, and, instead, transferring
> the funds to a Reorganized Debtor operating account so that they could be applied
> in repayment of certain secured debts of the Reorganized Debtors before the
> commencement of the [2019 Bankruptcy proceeding].  These actions were
> intentional and violated the terms of the Confirmation Order.

(App. 135.)  Deutsche Bank further averred there existed "no disputed material facts" and that it

should receive summary judgment against Gymboree as a matter of law for civil contempt "in

the amount of the loss sustained and for reasonable attorney's fees."  (*Id*.)

In response, Gymboree filed its renewed motion to dismiss and motion for summary

judgment.  (App. 435.)  Gymboree first noted that the confirmation of a bankruptcy plan creates

contractual obligations between a debtor and its creditors.  (App. 440.)  As a result, the

Bankruptcy Court had to examine whether the parties intended to create a trust in accordance

with the terms of the 2017 Plan.  (*Id*.)  Gymboree agreed that a dispute of material fact did not

exist:  "The fact that [Deutsche Bank] did not receive a final payment from the [General

Unsecured Creditors] Distribution is not in dispute, and the terms of the Plan are certainly not in

dispute.  Accordingly, the construction of contractual language is simply a question of law for

the Court."  (App. 440–41.)  Gymboree argued that the 2017 Plan did not create a trust, and

noted that Deutsche Bank's claims rested on "trust language to describe the [General Unsecured

Creditors] Distribution, without attempting to prove its trust theory . . . .  But without proving

[Deutsche Bank's] trust theory, the [General Unsecured Creditor] Distribution represented

nothing more than a pool of money that would be applied to pay an unsecured debt.  [Deutsche

Bank] remains a general unsecured creditor, and [Deutsche Bank] has not 'sustained losses' as a result of Reorganized Debtors failure to pay that unsecured debt immediately before filing their second bankruptcy."  (App. 458.)  Gymboree asserted that the Bankruptcy Court should not award summary judgment to Deutsche Bank because it was merely a "general unsecured creditor, not the beneficiary of a trust."  (App. 459.)

>    **D.    The Bankruptcy Court Awards Summary Judgment to Gymboree After Finding that the 2017 Plan Did Not Require Gymboree to Hold the Funds in Trust for the General Unsecured Creditors**

On May 26, 2020, the Bankruptcy Court awarded summary judgment to Gymboree. (App. 772.)  The Bankruptcy Court found "that the confirmed chapter 11 plan in the [2017 Bankruptcy Case] did not require that the Funds be held in trust and further [discerned] that the disbursement of those Funds did not result in a breach of trust."  (App. 774.)  The Bankruptcy Court concluded that the actions alleged in the Complaint did not constitute grounds to find Gymboree in contempt for violation of a court order.  (*Id*.)  Therefore, the Bankruptcy Court awarded summary judgment to Gymboree as to all counts of the Complaint.  (*Id*.)

At the outset, the Bankruptcy Court determined that Delaware law controlled the 2017 Plan and Confirmation Order.[5]  (App. 780.)  Delaware law requires "definite, explicit and unequivocal words," or "circumstances so revealing and compelling as to manifest the intention with all reasonable certainty" to create a trust.  (*Id.* (citation omitted).)  Because Deutsche Bank did not allege the existence of any trust instrument, the Bankruptcy Court reviewed the terms of the 2017 Plan to determine whether it created a trust "discernable through interpretation of the Plan and Confirmation Order or by. . . circumstances where the intention to establish a trust is reasonably certain."  (*Id*.)

---

[5] The Parties do not dispute that Delaware law controls

Reviewing the 2017 Plan, the Bankruptcy Court determined that it did not create a trust by means of interpretation or circumstance.  First, after interpreting the terms of the Plan, the Bankruptcy Court concluded that the words "in trust" found in Article VII.D of the 2017 Plan applied only to "disputed Class 5 claims in order to preserve the disputed claimholders' share of funds actually disbursed."  (*Id.* 781.)  Deutsche Bank did not hold a disputed Class 5 claim.  (*Id.*)  The Bankruptcy Court concluded that "[n]othing in the Plan or the Confirmation Order created or required the creation of any trust for the [General Unsecured Creditor] Distribution other than to preserve the disputed claimholders' portion of disbursed funds."  (App. 783.)

Second, looking to the extrinsic evidence, the Bankruptcy Court similarly found that the circumstances surrounding the 2017 Plan also did not create a trust.  The Bankruptcy Court found that contrary to Deutsche Bank's assertion, "[t]he Complaint is void of any factual allegations that would support a finding that the parties intended to create a trust."  (*Id.*)  In sum, the Bankruptcy Court determined:

> Neither the Plan nor the Confirmation Order required that the [General Unsecured Creditor] Distribution be held in trust.  When the Complaint's factual allegations are separated from its legal conclusions, the result is that the Complaint fails to state a claim upon which relief can be granted.  At best, the allegations of the Complaint establish an unsecured claim against the Debtors but not a claim for breach of trust.

(App. 784.)  Because no trust existed, Deutsche Bank's claims—which rested on the premise that the funds were to be held in trust—failed.  (App. 785–87.)

Regarding Claim Six, Deutsche Bank's request for civil contempt, the Bankruptcy Court recited the stipulation of undisputed facts before deciding that "[n]either the facts nor the law supports Deutsche Bank's position."  (App. 793.)  The Bankruptcy Court noted that Gymboree was "dealing with circumstances not contemplated in either the Confirmation Order or [2017] Plan—a second bankruptcy."  (App. 794.)  Gymboree's "obligations in connection with the

[General Unsecured Creditor] Distribution were unclear, at best." (*Id*.) Deutsche Bank, therefore, did not carry "its burden of proving that [Gymboree's] conduct was objectively unlawful under the Confirmation Order by clear and convincing evidence." (App. 794.) The Bankruptcy Court recognized that its decision did not leave Deutsche Bank without a remedy: rather than pursue claims based on the existence of a trust, Deutsche Bank could have pursued action through the claim reconciliation process. (App. 785.)

### E.    Deutsche Bank Appeals the Bankruptcy Court's Ruling

Deutsche Bank raises three questions on appeal challenging the Bankruptcy Court's ruling in favor of Gymboree. (Appellant's Br. 3–4, ECF No. 7.) Deutsche Bank argues that the Bankruptcy Court erred when denying its contempt claim because Gymboree "intentionally violated the clear and express command of Paragraph 140[6]of the Confirmation Order that upon completion of the claim allowance process they were to distribute cash in the Reserve *pro rata* to the holders of allowed Class 5 claims." (*Id.* 10.) Deutsche Bank next contends that the Bankruptcy Court erred in finding that it was not a beneficiary of an alleged General Unsecured Creditors trust, emphasizing that the Bankruptcy Court misconstrued the effect of the words "in the same Pro Rata Share in Trust." (*Id.* 11.) Lastly, Deutsche Bank asserts that the Bankruptcy Court erred in denying it summary judgment "on the sole ground that the [2017] Plan and Confirmation Order could not be interpreted to recognize [Deutsche Bank] as a trust beneficiary merely because its originally disputed Class 5 Claim had been allowed." (*Id*.)

---

[6] Paragraph 140 of the Confirmation Order further provided that "the Debtors or the Reorganized Debtors, as applicable, shall establish on the Effective Date, a ***segregated account*** by depositing the [General Unsecured Creditors] Distribution into the Class 5 Claims Reserve for the benefit of Holders of Allowed Class 5 Claims to be paid as set forth in Article VII.D of the plan." (2017 Plan 64.)

In response, Gymboree argues that the Bankruptcy Court correctly found that the 2017 Plan did not create a trust and Deutsche Bank had no ownership interest in the General Unsecured Creditors Distribution.  (Appellee's Br. 20, ECF No. 9.)  "Without the existence of a trust or any ownership interest by [Deutsche Bank] in the [General Unsecured Creditors] Distribution, none of the individual Appellees could be found liable for 'aiding and abetting' breach of trust or conversion."  (*Id.*)

Gymboree also filed a Motion to Dismiss the appeal as frivolous.  (Mot., ECF No. 8.)  Gymboree contends Deutsche Bank "materially misrepresented the holdings and related analysis provided in the Bankruptcy Court's Memorandum Opinion," "misrepresented other contentions not found in the record," and "failed to include any appendix or other citation to the record to support its arguments."  (Mot 1–2, ECF No. 8.)  Gymboree further asserts that Deutsche Bank waived certain arguments by failing to include them in the Rule 8009 statement of the issues when initiating the instant appeal.  (*Id.* 2.)  Deutsche Bank responded to the Motion to Dismiss, and Gymboree replied.

## II.  Applicable Legal Standards

### A.    Standard of Review: The District Court Functions as an Appellate Court for Bankruptcy Cases

Final orders of a bankruptcy court are appealable to a district court pursuant to 28 U.S.C. § 158(a).  "When reviewing a decision of the bankruptcy court, a district court functions as an appellate court and applies the standards of review generally applied in federal courts of appeal." *Paramount Home Entm't Inc. v. Circuit City Stores, Inc.*, 445 B.R. 521, 526–27 (E.D. Va. 2010) (citing *Webb v. Reserve Life Ins*. (*In re Webb*), 954 F.2d 1102, 1103–04 (5th Cir. 1992)).  The district court reviews the bankruptcy court's legal conclusions *de novo* and its factual findings

for clear error.[7]  *Stancill v. Harford Sands, Inc.* (*In re Harford Sands Inc.*), 372 F.3d 637, 639 (4th Cir. 2004).  A finding of fact is clearly erroneous if a court reviewing it, considering all of the evidence, "is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)); *accord Educ. Credit Mgmt. Corp. v. Mosko* (*In re Mosko*), 515 F.3d 319, 324 (4th Cir. 2008) (quoting *United States Gypsum Co.*, 333 U.S. at 395).  "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."  *Anderson*, 470 U.S. at 574.  In cases where the issues present mixed questions of law and fact, the Court will apply the clearly erroneous standard to the factual portion of the inquiry and *de novo* review to the legal conclusions derived from those facts.  *Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond*, 80 F.3d 895, 905 (4th Cir. 1996).  "Decisions committed to the discretion of the bankruptcy court are reviewed for abuse of discretion."  *In re Mitrano*, 409 B.R. 812, 815 (E.D. Va. 2009).

Out-of-circuit case law instructs that district courts should employ the abuse of discretion standard when considering the bankruptcy court's interpretation of its own order.  *See In re Optical Techs., Inc.*, 425 F.3d 1294, 1300 (11th Cir. 2005).  Although the United States Court of Appeals for the Fourth Circuit has not spoken on this issue in a published opinion, other courts have expressed "reluctan[ce] to disturb a bankruptcy court's judgment" when the bankruptcy court is reviewing its own orders.  *See In re Consolidated Indus. Corp.*, 360 F.3d 712, 716 (7th Cir. 2004) ("We will not reverse a [bankruptcy] court's interpretation of its own order unless it is a 'clear abuse of discretion,' because a court that issued an order is in the best position to interpret it."); *In re Dial Business Forms, Inc.*, 341 F.3d 738, 744 (8th Cir. 2003) (adopting abuse

---

[7] In this case, the Bankruptcy Court did not resolve any disputed issues of fact. (App. 792.)

of discretion review and collecting cases from the Second, Fifth, and Sixth Circuits that have done the same).  The United States Court of Appeals for the Third Circuit similarly holds that a "bankruptcy court's interpretation of its own order ought to be subject to review for an abuse of discretion, [but t]his deferential standard should not apply . . . if the issue being reviewed presents only a question of law."  *In re Shenango Grp. Inc.*, 501 F.3d 338, 346 (3d Cir. 2007). Because "[a] bankruptcy court is in the best position to interpret its own orders," the district court should only overturn "a bankruptcy court's interpretation of its own . . . if an abuse of discretion is found."  *In re Armstrong Energy Inc.*, 613 B.R. 529, 531 (B.A.P. 8th Cir. 2020) (citations omitted).

        **B.**      **Creating a Trust Pursuant to Delaware Law**

        Pursuant to Delaware law, a party seeking to prove an express trust must demonstrate an intent to establish such a trust.  *Otto v. Gore*, 45 A.3d 120, 130 (Del. 2012).  In "order to meet this burden, the party must prove the existence of a trust with clear and convincing evidence." *Id.* at 129.  The Supreme Court of Delaware has explained that the intent to create a trust can be demonstrated either "by definite, explicit and unequivocal words, or by circumstances so revealing and compelling as to manifest the intention with all reasonable certainty."  *Id.* at 130 (quoting *Levin v. Smith*, 513 A.2d 1292, 1297 (Del. 1986)); *see also In re Moran*, 413 B.R. 168, 186 (Bankr. D. Del. 2009) ("The elements of an express trust are a competent settlor and trustee, intent, sufficient words to create a trust, an ascertainable trust res, certain and ascertained beneficiaries, a legal purpose, and a legal term.").

        In accordance with this directive, courts look to intrinsic or extrinsic evidence "[w]hen determining whether a settlor has formed the requisite *intent to create* a final, enforceable trust." *Otto*, 45 A.3d at 130 (emphasis in original).  Intrinsic evidence means evidence existing within

the writing or document terms. *Id.* "In the trust context, this type of evidence refers to the trust instrument itself." *Id.* Extrinsic evidence means "evidence relating to a contract but not appearing on the face of the contract." *Id.* Such evidence, for example, may include the circumstances surrounding the creation of the trust or the conduct of the parties involved. *Id.* at 130–31 (footnotes omitted).

Generally, courts cannot consider extrinsic evidence to interpret the meaning of specific terms in a written trust instrument.[8] *Id.* Courts may properly consider extrinsic evidence, however, to determine the issue of intent to create a trust. *Id.*

## III.  Analysis

The Court firsts consider Gymboree's Motion to Dismiss before turning to the appellate briefs. For the reasons set forth below, the Court will deny the Motion to Dismiss and affirm the Bankruptcy Court.

### A.    The Court Will Deny the Motion to Dismiss the Appeal as Frivolous

In its Motion, Gymboree asks "that the Court dismiss this appeal as frivolous and award [Gymboree] their attorneys' fees and costs incurred to respond to this appeal." (Mot. 2.) Federal Rule of Bankruptcy Procedure 8020 provides that "[i]f a district court . . . . determines that an appeal from an order . . . of a bankruptcy judge is frivolous, it may, after a separately filed

---

[8] This parallels the basic rules of contract interpretation in accordance with Delaware law. "Although the law of contract generally strives to enforce agreements in accord with their makers' intent, the objective theory considers objective acts (words, acts and context) the best evidence of that intent." *MBIA Ins. Corp. v. Royal Indem. Co.*, 426 F.3d 204, 210 (3d Cir. 2005) (internal quotation marks and citations omitted). "Unambiguous written agreements should be enforced according to their terms, without using extrinsic evidence to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity." *Id.* (internal quotation marks and citations omitted). This relationship follows Fourth Circuit precedent to liken a bankruptcy plan to a contract. *See also In re Varat Enterprises, Inc.*, 81 F.3d 1310, 1317 (4th Cir. 1996) ("Under the Bankruptcy Code, a confirmed plan of reorganization acts like a contract that is binding on all of the parties, debtor and creditors alike.") (citing 11 U.S.C. § 1141(a)).

motion . . . award just damages and single or double costs to the appellee."[9]  Fed. R. Bankr. P.

8020.  "Because the language of Bankr[uptcy] Rule 8020 is materially identical to Fed. R. App.

P. 38, the sanctions provision for the filing of frivolous appeals in the Court of Appeals, the

standard for imposing sanctions is similar."  *In re Prop. Movers, L.L.C.*, 31 F. App'x 81, 83 (4th

Cir. 2002) (citing *Pettey v. Belanger*, 232 B.R. 543, 548 (D. Mass. 1999)).

 "A court considering a motion for sanctions for the filing of a frivolous appeal must 'first

determine that the appeal is frivolous, and then determine that this is an appropriate case for the

imposition of sanctions.'"  *In re Prop. Movers*, 31 F. App'x at 84 (quoting *Williams v. U. S.

Postal Service*, 873 F.2d 1069, 1075 (7th Cir. 1989)).  "An appeal is frivolous when the result is

obvious or when the appellant's argument is wholly without merit."  *In re Lapke*, 428 B.R. 839,

844 (8th Cir. BAP 2010) (internal citation omitted); *see also In re Prop. Movers*, 31 F. App'x at

84 (noting an appeal may be frivolous where "the result is obvious or when the appellant's

argument is wholly without merit," and appellant "cites no relevant cases in response to a lower

court's accurate exposition of the law, and where an appellant's arguments are irrelevant to the

issues in dispute") (citation omitted).

 The Court will deny the Motion to Dismiss because it does not find that this appeal

constitutes a frivolous action.  This is so because the appeal concerns how to interpret provisions

of the 2017 Plan.  The issue here focuses on the type of claims Deutsche Bank brought in its

adversary proceeding and whether the 2017 Plan created a trust, which requires reviewing the

---

[9] Relatedly, pursuant to Federal Rules of Bankruptcy Procedure 9011, the Court may
dismiss a claim as frivolous if the allegations and other factual contentions lack evidentiary
support and, if specifically so identified, are not likely to have evidentiary support after a
reasonable opportunity for further investigation or discovery, or if the denials of factual
contentions are not warranted on the evidence, or, if specifically so identified, are not reasonably
based on a lack of information or belief.  Fed. R. Bankr. P. 9011(b); *see also Law v. Siegel*, 571
U.S. 415, 427 (2014) (noting that Federal Rule of Bankruptcy Procedure 9011 is "bankruptcy's
analogue to Civil Rule 11").

Bankruptcy Court's conclusions surrounding the relevant plan provisions and any extrinsic evidence concerning the Parties' intent to form a trust.  Indeed, the Bankruptcy Court observed that Gymboree's "obligations in connection with the [General Unsecured Creditor] Distribution were unclear, at best."  (App. 794.)  Even though the Court will affirm the judgment of the Bankruptcy Court for the reasons set forth below, this does not mean Deutsche Bank's claims on appeal are wholly without merit.  Accordingly, the Court will deny the Motion to Dismiss this appeal as frivolous.

### B.   The Court Will Affirm the Bankruptcy Court Because it Properly Concluded That the 2017 Plan Did Not Create a Trust for the Benefit of the General Unsecured Creditors

Having decided the Motion to Dismiss, the Court turns to the instant appeal.  Despite the manner in which Deutsche Bank frames the issues on appeal, this Court considers whether the Bankruptcy Court abused its discretion in holding that the 2017 Plan and Order did not create a trust for the benefit of the General Unsecured Creditors, including Deutsche Bank.[10]  After review, the Court concludes that the intrinsic and extrinsic evidence does not establish that the 2017 Plan intended to create a trust for the benefit of all General Unsecured Creditors, meaning the Court will affirm the judgment of the Bankruptcy Court.

---

[10] The Court finds the abuse of discretion standard more appropriate because the Bankruptcy Court merely reviewed the terms of its own order confirming the 2017 Plan when deciding whether the Parties intended to create a trust.  The Bankruptcy Court did not interpret statutes, procedural rules, or other legal matters.  Furthermore, the Parties did not introduce extrinsic evidence for the Bankruptcy Court to consider when resolving the question of trust creation.  Even if this Court considered the issue under the *de novo* standard of review, it would reach the same result.

### 1.  **The Intrinsic Evidence Does Not Establish the Intent to Create a Trust**

Because the plain language of Article VII.D does not support Deutsche Bank's argument that the 2017 Plan obligated Gymboree to hold the General Unsecured Creditors Distribution in trust, the Court concludes that the Bankruptcy Court did not abuse its discretion in finding the same after reviewing the terms of the 2017 Plan.

Deutsche Bank brought its underlying adversary proceeding based on claims for breach of trust and conversion, aiding and abetting breach of trust and conversion, turnover of property, and contempt.  (App. 26–31.)  As such, Deutsche Bank's action rests on the assertion that Article VII.D in the 2017 Plan obligated Gymboree to hold the Class 5 Claims Reserve in trust for the benefit of Deutsche Bank (and others).  (App. 781, 783.)  Without the existence of a trust, Deutsche Bank's claims fail.  Reviewing the terms of the 2017 Plan, the Court first concludes, as did the Bankruptcy Court, that the plain language of Article VII.D does not support Deutsche Bank's argument that the General Unsecured Creditors Distribution was to be held in trust for all Class 5 Claims.

The relevant provision in Article VII.D provides that "the Reorganized Debtors [Gymboree] shall make a Pro Rata distribution to all Allowed Class 5 Claims from the Class 5 Claims Reserve using the [General Unsecured Creditors] Amount as the denominator in calculating such Pro Rata Distribution."[11]  (2017 Plan 114.)  Article VII.D further instructed "[t]he Reorganized Debtors [to] make one or more additional distributions to Class 5 Allowed Claims, in its discretion, until all Class 5 Claims have been resolved."  (*Id*.)  The same provision stated that "[t]he Reorganized Debtors shall hold in Cash in the Class 5 Claims Reserve in the

---

[11]  The 2017 Plan further defined "Class 5 Claims Reserve" as "a reserve of Cash that will be funded with the [General Unsecured Creditors] Distribution into a separate reserve account on the Effective Date pursuant to Article VII.D hereof to pay all Allowed Class 5 Claims."  (2017 Plan 79.)

same Pro Rata share in trust for the benefit of the Holders of Disputed Class 5 Claims." (*Id.*) "Once all Class 5 Claims have been resolved, the Reorganized Debtors shall make a final distribution in order to distribute the remaining Cash in the Class 5 Claims Reserve Pro Rata to all Class 5 Allowed Claims using the total amount of Class 5 Allowed Claims as the denominator." (*Id.*)

Rather than creating a trust for all General Unsecured Creditors, Article VII.D emphasized that the General Unsecured Creditors Distribution should be paid out to the holders of Allowed Class 5 Claims after the Disputed Class 5 Claims had been resolved. Although Article VII.D further directed Gymboree to make a final payment to distribute the remaining cash in the Class 5 Claims reserve to all Class 5 allowed claims, such language did not establish the creation of a trust.[12]

In the proceedings below, the Bankruptcy Court examined the 2017 Plan terms to determine whether it required Gymboree to hold certain funds in trust for Deutsche Bank. While the Bankruptcy Court considered the strictures of Delaware law, it merely interpreted the plain

---

[12] In contrast to the language contained in Article VII.D, the 2017 Plan created a trust in Article II.B for the Professional Fee Escrow Account, which provides:

> On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount. *The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals.* Such funds shall not be considered property of the Estates. The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors as soon as reasonably practicable after such Professional Fee Claims are Allowed. When all Allowed amounts owing to the Professionals have been paid in full, any amount remaining in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court. If the Professional Fee Escrow Account is insufficient to fund the full Allowed amounts of Professional Fee Claims, the remaining unpaid Allowed Professional Fee Claims will be paid by the Reorganized Debtors.

(2017 Plan 92.)

language of its own Confirmation Order.  The primary question, then, was whether the terms of the 2017 Plan created a trust.  The Bankruptcy Court concluded that "[t]he Class 5 Claims Reserve was not a trust, nor was it required to be a trust."  (App. 782 n.13.)

On appeal, Deutsche Bank itself recognizes that "[t]he fourth sentence in Article VII.D standing alone was insufficient to create a trust."  (Appellant's Br. 40, ECF No. 7.)  Furthermore, the relevant sentence in Article VII.D that refers to the trust applies to disputed claims.  Deutsche Bank does not argue that it held a disputed claim or that it was otherwise entitled to funds held for the benefit of disputed claims holders.

Deutsche Bank argues, however, that there are "many factors" present in the 2017 Plan supporting the existence of a trust.  (Appellant's Br. 36.)  Pursuant to Article VII.D, Gymboree was required to establish the segregated account and administer it.  (*Id*.)  The 2017 Plan directed Gymboree to make "mandatory initial and discretionary interim distributions from the Reserve to then-holders of allowed Class 5 Claims." (*Id.* 37.)  "Under Paragraph 140 of the Confirmation Order, the beneficiaries of the Reserve were stated to be the holders of allowed Class 5 Claims." (*Id*.)  According to Deutsche Bank, these factors, in addition to Article VII.D, present "compelling evidence that [Gymboree] serve as trustees of the Reserve for all holders of allowed and potentially allowable claims."  (*Id.* 39.)

Upon review, Paragraph 140 does not identify "beneficiaries" or otherwise support the creation of a trust.  Although that paragraph mentions holding monies for the "benefit" of Allowed Class 5 Claims holders, it merely provides that Gymboree "shall establish, on the Effective Date, a segregated account by depositing the [General Unsecured Creditors] Distribution into the Class 5 Claims Reserve for the benefit of Holders of Allowed Class 5 Claims to be paid as set forth in Article VII.D of the Plan."  (2017 Plan 64.)  The Parties do not

dispute that Gymboree created a segregated account on the effective date of the 2017 Plan. (App. 759.)  Pursuant to Article VII.D, Deutsche Bank, as a holder of an Allowed Class 5 Claim, received $2,510,193.91 from the initial distribution of the Class 5 Claims Reserve under the 2017 Plan.  (App. 759.)

Deutsche Bank further asserts that Gymboree violated the 2017 Plan and Confirmation Order because "Article VII.D . . . required [Gymboree] to conduct and pay for the process" of allowing disputed claims.  (Appellant's Br. 18.)  Deutsche Bank contends that "the $4.5 million [General Unsecured Creditors] distribution was to be paid into a segregated Reserve account on the Plan Effective date for the benefit of holders of allowed Class 5 Claims." (*Id*.)  Thereafter, the "Reserve was to be distributed as provided in the Plan, [and] Article VII.D . . . required a final pro rata distribution of the Reserve to holders of allowed Class 5 Claims upon completion of the allowance process as if claims had been allowed on the Plan Effective Date." (*Id*.)  While the Confirmation Order may have directed Gymboree to make such payments for the remaining Class 5 Claims from a segregated account, it did not result in the creation of a trust for all Class 5 Claims holders.  As the Bankruptcy Court observed, this conclusion did not leave Deutsche Bank without a remedy.  Rather than pursue claims based on the existence of a trust, Deutsche Bank could have pursued action through the claim reconciliation process.  (App. 785.)

Thus, the intrinsic evidence—the plain language of the 2017 Plan—does not establish the intent to create a trust for the benefit of Deutsche Bank.  As a result, the Bankruptcy Court did not abuse its discretion when interpreting the plain language of its own Confirmation Order.  The Court next reviews the circumstances surrounding the 2017 Plan to determine whether extrinsic evidence shows the intent to create a trust.

19

### 2.  <u>The Extrinsic Evidence Does Not Establish the Intent to Create a Trust</u>

On appeal, Deutsche Bank does not identify extrinsic evidence to show the intent to

create a trust.  Deutsche Bank's Brief, like the underlying complaint and the stipulation of

undisputed facts, lacks factual allegations external to the 2017 Plan that would support a finding

that the Parties intended to create a trust.  Additionally, the record does not show the existence of

a separate trust instrument.

The Bankruptcy Court upheld the terms of the 2017 Plan as written, rather than

employing extrinsic evidence to rewrite or interpret its terms.  Because extrinsic evidence does

not support the existence of a trust, the Bankruptcy Court did not abuse its discretion in

determining that Deutsche Bank could not bring its claims based on a trust theory.

### 3.  <u>The Record Does Not Support Finding Gymboree in Contempt</u>

Lastly, the Bankruptcy Court did not err when it denied Deutsche Bank's claim for

contempt.  Relevant to the instant appeal, the Supreme Court of the United States ruled in

*Taggart v. Lorenzen* that a Bankruptcy Court may hold a creditor in civil contempt for

attempting to collect on a debt that has been discharged in bankruptcy "if there is no fair ground

of doubt as to whether the [discharge] order barred the creditor's conduct."  139 S. Ct. 1795,

1799 (2019).  Since *Taggart*, courts have recognized that violation of a bankruptcy order may

result in a finding of contempt where there is no fair ground of doubt as to the meaning of the

order.[13]  *See, e.g., In re Carnegie*, 621 B.R. 392, 410 (Bankr. M.D.N.C. 2020) (describing the

fair ground of doubt standard in the bankruptcy context).

---

[13] As one bankruptcy court described, after *Taggart*, the three elements that must be
proven for a court to find a party in civil contempt are:

(1) the party violated a definite and specific order of the court requiring him [or
her] to perform or refrain from performing a particular act or acts; (2) the party

The Court concludes that the record before it does not warrant a claim for contempt.  As the Bankruptcy Court acknowledged, "[t]he evidence establishes that there was a fair ground of doubt about whether [Gymboree] had an absolute duty to pay the remaining Funds in the [General Unsecured Creditors] Distribution to Class 5 claimants."  (App. 794.)  Gymboree sought advice from the Berkeley Research Group before moving funds, and its counselors advised Gymboree that the funds in dispute could be moved.  Deutsche Bank admitted that "Article VII.D was hurriedly drafted on the eve of the confirmation hearing as a last minute amendment to avert a Class 5 objection to confirmation, which rush may account for the way it was drafted."  (App. 92.)  Article VII.D does not represent a model of clarity, meaning a fair ground of doubt exists concerning its requirements.

Because there is fair ground for doubt concerning the requirements of the 2017 Plan and related disbursements, the record does not warrant a finding of contempt.  The Court will affirm the Bankruptcy Court's decision to grant Gymboree's cross motion for summary judgment as to Deutsche Bank's contempt claim.

---

did so with knowledge of the court's order; and (3) there is no fair ground of doubt as to whether the order barred the party's conduct — i.e., no objectively reasonable basis for concluding that the party's conduct might be lawful.

*In re City of Detroit*, 614 B.R. 255, 265–66 (Bankr. E.D. Mich. 2020).

### IV.  Conclusion

For the reasons set forth above, the Court will deny the Motion to Dismiss and affirm the

judgment of the Bankruptcy Court.

An appropriate order shall issue.

/s/

M. Hannah Lauck
United States District Judge

Date: August 16, 2021
Richmond, Virginia

22